Filed 6/1/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| DANIEL LARSEN, | B297857 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BS170693) |
| v. | |
| CALIFORNIA VICTIM COMPENSATION BOARD, | ORDER MODIFYING OPINION |
| Defendant and Respondent. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed on May 11, 2021, be modified as follows:

On page 18, the following citation is added after the footnote reference number in line 5: "(§ 1485.55, subd. (a); see also § 4902, subd. (a).)"

On page 35, "The key reckoning with *Schlup* in *Souliotes* instead comes in a single sentence and citation" is revised to read

"The key reckoning with *Schlup* in *Souliotes* instead comes in two sentences and a single citation"

    There is no change in judgment.

_____

BAKER, J.                RUBIN, P. J.                MOOR, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| DANIEL LARSEN, | B297857 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BS170693) |
| v. | |
| CALIFORNIA VICTIM COMPENSATION BOARD, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James C. Chalfant, Judge.  Reversed and remanded with directions.

Singleton Schreiber McKenzie & Scott, Benjamin I. Siminou; Thorsnes Bartolotta McGuire, Brett J. Schreiber; California Innocence Project, Katherine N. Bonaguidi for Plaintiff and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Michael A. Canzoneri, Supervising Deputy Attorney General, and Heather S. Gimle, Deputy Attorney General, for Defendant and Respondent.

After a federal district court granted a petition for writ of habeas corpus triggering plaintiff Daniel Larsen's (Larsen's) release from prison after 13 years of confinement, Larsen filed a claim with the California Victim Compensation Board (the Board)[1] seeking compensation as a wrongfully convicted person. The Board denied Larsen's claim, concluding it was entitled to make its own determination of whether Larsen was factually innocent because the district court's finding that no reasonable juror would convict Larsen did not predetermine the question and obviate the need for a Board hearing. Larsen then sought mandamus relief in the trial court, and the court upheld the Board's determination. We consider whether the Board was entitled to hold a hearing on Larsen's compensation claim, which leads us to opine on what qualifies as a finding of "factual innocen[ce]" under the pertinent statutory provision.

## I. BACKGROUND

As we shall explain in more detail, in 1999 a jury convicted Larsen of a felony violation of former Penal Code[2] section 12020, subdivision (a), which prohibited carrying a concealed dirk or dagger. Larsen admitted he sustained three prior felony convictions and the trial court sentenced him to 28 years to life in prison. Larsen's direct appeal and state court habeas petitions were unsuccessful, but in 2010, the United States District Court

---

[1] Until 2016, the California Victim Compensation Board was known as the California Victim and Government Claims Board. (Stats. 2016, ch. 31, § 103.)

[2] Undesignated statutory references that follow are to the Penal Code.

for the Central District of California made an actual innocence finding (the particulars of which we will describe) and granted his petition for writ of habeas corpus, which led to his release from custody.

### A.     *Larsen's Criminal Trial*

The prosecution called three Los Angeles Police Department witnesses at Larsen's trial: officers Thomas Townsend and Michael Rex and detective Kenneth Crocker. Larsen's attorney put on no defense case.

Officer Townsend testified he and his partner, Officer Rex, responded to a report of shots fired at the Gold Apple bar around 1:00 a.m. on June 6, 1998.  The reporting party claimed the shooter was a man with a long ponytail wearing a green flannel shirt.

When they arrived at the bar's parking lot, Officer Townsend immediately focused on "a person with a green flannel," who was later identified by the officer as Larsen.  Officer Townsend and his partner were standing 20 to 30 feet from Larsen, and because Officer Townsend believed Larsen might be armed, he initially had "tunnel vision" and focused his gaze on Larsen's hands.

Officer Townsend testified he saw Larsen crouch and reach beneath his untucked shirt to remove an object from his waistband that he then tossed under a nearby vehicle.  According to Officer Townsend, he saw where the object landed and found in that location a knife with a double-edged blade and a "finger guard."  Officer Townsend also found a short copper bar wrapped in cloth tape nearby, but in the opposite direction from that

3

where he saw Larsen throw the knife. Officer Townsend testified he did not see anyone throw the copper bar.

On cross examination, Officer Townsend acknowledged he was mistaken when he previously testified Officer Rex was driving the patrol car that night. Officer Townsend also conceded he did not mention in previous testimony that the knife was concealed. Although the knife was extremely sharp and Larsen did not have anything on him to sheath the knife when he was arrested, Officer Townsend did not recall any cuts to Larsen's body or clothing.

Similar to Officer Townsend, Officer Rex testified he focused on Larsen when arriving at the bar because Larsen resembled the description of the reported gunman. Officer Rex testified he saw Larsen reach under his green flannel shirt, pull a shiny metal object from his waistband, and toss the object beneath the vehicle next to him. While Larsen and others were being taken into custody, Officer Rex kept an eye on the object Larsen threw under the vehicle to "mak[e] sure nobody walked up and discarded" it. Officer Rex then saw Officer Townsend retrieve the item, which turned out to be a knife. Officer Rex did not see anyone throw the copper bar Officer Townsend found, and Officer Rex was certain the bar was not the object he saw Larsen throw because it was wrapped in tape and would not have reflected his patrol car's spotlights as the knife did.

Detective Crocker testified Larsen was originally booked into custody under a false name and that the knife was not examined for fingerprints.

During a hearing to determine whether certain prior convictions could be used to impeach Larsen if he decided to testify, Larsen's trial counsel made an offer of proof that Larsen

4

would testify the copper bar was in his pocket and he discarded it when the police arrived.

### B. Direct Appeal and State Court Habeas Petitions

On direct appeal of his conviction at trial, Larsen challenged certain evidentiary rulings, a jury instruction regarding consciousness of guilt, and his sentence. The Court of Appeal affirmed the judgment, and our Supreme Court denied review. Larsen's efforts to obtain habeas relief in state court were unsuccessful.

### C. Larsen's Federal Habeas Petition
#### 1. The court's actual innocence finding permitting consideration of the procedurally barred petition

In 2008, Larsen filed a petition for writ of habeas corpus in federal district court contending his trial attorney was constitutionally ineffective for (among other things) failing to present testimony from two eyewitnesses who would have said he was not the one who threw the knife. The Attorney General moved to dismiss the petition because it was untimely under the Antiterrorism and Effective Death Penalty Act, which establishes a one-year statute of limitations running from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." (28 U.S.C. § 2244(d)(1)(A).)

Procedural limitations on habeas corpus relief like this timely filing rule will not prevent a federal court from deciding the merits of a habeas corpus petition if the petitioner presents evidence (e.g., "exculpatory scientific evidence, trustworthy

eyewitness accounts, or critical physical evidence") that establishes "'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" (*Schlup v. Delo* (1995) 513 U.S. 298, 324, 326-327 (*Schlup*).) The magistrate accordingly held an evidentiary hearing to determine whether Larsen's petition could be considered on the merits under *Schlup*. Larsen called three witnesses: James McNutt (Mr. McNutt), Elinore McNutt (Mrs. McNutt), and Brian McCracken (McCracken). Larsen also presented declarations from two other witnesses: William Hewitt (Hewitt) and Jorji Owen (Owen).

Mr. McNutt, a former police chief in North Carolina, testified he accompanied his wife to the Gold Apple bar to meet his step-son, Daniel, on the night of Larsen's arrest. Mr. McNutt parked his vehicle near Daniel and observed two men, Larsen and a man he heard Daniel call "Bunker" (Hewitt's moniker), arguing with Daniel. Mr. McNutt approached and "had words with" Hewitt from about two feet away. Hewitt wore a loose, short-sleeved shirt. After about two minutes, when Mr. McNutt heard someone yell the police had arrived, Mr. McNutt saw Hewitt throw something—an object he characterized as "probably" a knife—under a vehicle parked next to Daniel. The item was 10-12 inches long and made a "light metallic sound" when it hit the ground. When asked whether the item could have been a "copper weight," Mr. McNutt testified a copper weight would have made a different sound. Larsen, according to

6

Mr. McNutt, "just went ahead, turned around, [and] walked normal" when the police arrived.[3]

Mrs. McNutt testified that as she and Mr. McNutt walked from their truck to the bar, she saw Larsen and a man she knew as Bunker approaching Daniel's car. She did not know Larsen, but she knew Hewitt's moniker because he had "come to the house" a week or two earlier. Hewitt was wearing a baggy Hawaiian shirt. Mrs. McNutt saw Larsen and Hewitt "hurrying" in a manner that "didn't look right" and she told Mr. McNutt something was "going on." Mrs. McNutt waited near her truck as Mr. McNutt approached Daniel's car. When someone yelled that the police had arrived, Mrs. McNutt saw Hewitt throw something under a car. She was not certain it was a knife, but it made a "metal, clank, skidding . . . noise." Larsen, on the other hand, "just stood there, kind of, dumbfounded" and turned and walked away. Mrs. McNutt testified she did not see anything in Larsen's hands.

McCracken testified he was seated inside the bar before the incident in the parking lot. He knew Larsen and did not see Larsen with a knife that evening. But a different man, who McCracken did not know, approached him at the bar and they "had some words." The man flashed a knife and threatened McCracken. McCracken testified he had a "really clear" recollection of the knife and it looked "pretty similar" to a photo of a knife found in Larsen's trial attorney's file.

---

[3] Police handcuffed Mr. McNutt but released him without asking what he had seen when they discovered he was a retired police officer.

Hewitt's 2001 declaration, which was part of the evidence presented to the federal magistrate judge, admitted the knife found by the police was his. Owen's declaration (she was Hewitt's girlfriend at the time) averred Hewitt told her that Larsen was arrested for possession of Hewitt's knife and Hewitt sold his motorcycle to raise funds for Larsen's bail because he felt responsible for Larsen being in jail.

The magistrate judge's report and recommendation to the district court concluded Larsen satisfied the *Schlup* standard to have his petition considered on the merits. Among other things, the magistrate judge found the McNutts and McCracken to be credible witnesses. The judge found the McNutts were standing "at least as close, if not closer" to Larsen than Officers Townsend and Rex were, and "it appear[ed] that Mr. McNutt was standing between [Larsen] and the police officers." Moreover, unlike Officers Townsend and Rex, "who were looking through a chain link fence," the McNutts had an "unobstructed" view of Larsen and Hewitt. The McNutts both testified "unequivocally that it was [Hewitt], not [Larsen], who threw something metallic sounding under a nearby car." The magistrate judge found: "[H]ad the jury been able to consider this same evidence, 'no reasonable juror would [have found [Larsen]] guilty beyond a reasonable doubt.'"

The district court adopted the magistrate judge's findings, conclusions, and recommendations, which meant Larsen's petition would be considered on the merits.

## 2. Habeas corpus relief and Larsen's release from custody

The magistrate judge held a second evidentiary hearing on the merits of Larsen's petition. Among other things, Larsen's trial attorney testified Larsen told him, after conviction but before sentencing, that the McNutts were witnesses to what happened on the night in question. The trial attorney, who was disbarred in 2008, decided not to contact the McNutts and move for a new trial because he felt the trial judge was "pro prosecution" and worried that he might "screw up any chance [Larsen] ha[d] on appeal."

The magistrate judge found Larsen's trial counsel performed deficiently by failing to investigate and locate exculpatory witnesses. Specifically, the judge found counsel should have interviewed Daniel, a known witness who likely would have directed the attorney to his parents (the McNutts), and should have, in any event, moved for a new trial when Larsen later told him about the McNutts.[4] The magistrate judge further found Larsen was prejudiced by his attorney's ineffective assistance based on the judge's earlier analysis of the Attorney

---

[4] The magistrate judge rejected the Attorney General's contention that the McNutts' testimony was not credible. Discrepancies regarding the time at which the incident occurred, the judge reasoned, were "unremarkable" given that more than a decade had passed. The fact that the McNutts' testimony conflicted with Larsen's trial attorney's proffer that Larsen would testify that he threw the copper bar did not mitigate the prejudice to Larsen because it would be "unreasonable to assume [Larsen's trial attorney] would have made such an offer of proof knowing that the McNutts planned to offer testimony that apparently conflicted with it."

9

General's motion to dismiss the habeas petition as untimely. The judge wrote: "[D]emonstrating prejudice under [*People v.*] *Strickland* [(1984) 466 U.S. 668] requires a lesser showing than that required to pass through the *Schlup* actual innocence gateway. As this court has already found that [Larsen] meets the more stringent *Schlup* test, it necessarily follows that he also satisfies the prejudice test under *Strickland*."

The district court adopted the magistrate judge's findings, conclusions, and recommendations; granted Larsen's petition; and ordered Larsen to be retried or released within 90 days. The Ninth Circuit Court of Appeals affirmed the district court's ruling in a published opinion and Larsen was released from prison in March 2013 without being retried.

### D.    *Larsen's Civil Suit*

In 2012—after the district court granted his habeas petition but before he was released from custody—Larsen sued the City of Los Angeles, Officer Townsend, Officer Rex, and Detective Crocker for violating his civil rights. Larsen alleged the officers arrested him without probable cause and knowingly presented false evidence.

At trial on the civil complaint, Officers Townsend and Rex both maintained they saw Larsen with a knife. Neither recalled seeing anyone who looked like Mr. McNutt, who is six feet, seven inches tall. Officer Rex did not recall seeing any women in the area. The deputy district attorney testified her office decided not to retry Larsen after his habeas petition was granted because he had already served a longer sentence than could be imposed under existing law.

Hewitt testified he was using various narcotics around the time of Larsen's arrest in 1998 and had no memory of that night because he was high. He did, however, "always ha[ve] a weapon on [him]" during this period. Hewitt claimed he was "super high" when he signed his 2001 declaration and did not read it.

Larsen testified he was standing a few feet from Hewitt as he argued with Daniel, whom Larsen had met a couple times. Hewitt was wearing a flannel shirt and had his hair pulled back in a ponytail. Larsen maintained he did not throw anything, but he saw Hewitt throw something when the police arrived. Larsen acknowledged he belonged to a gang at the time.

Mr. McNutt's account of the incident was substantially similar to his and Mrs. McNutt's testimony in the habeas proceedings, with perhaps two noteworthy variances. He testified Hewitt threw a knife (as opposed to an object that was "probably" a knife) and he testified, for the first time, that Hewitt wore his hair in a ponytail (contradicting earlier testimony by Mrs. McNutt that Hewitt's hair was short).

The civil trial jury returned a complete defense verdict.

### E. Motion for a Finding of Factual Innocence

In 2015, while his claim for compensation was pending before the Board, Larsen filed in federal district court a document styled as a "Motion/Request for Finding of Innocence." Citing *Douglas v. Jacquez* (9th Cir. 2010) 626 F.3d 501 at page 504 and other authorities, the same magistrate judge that heard Larsen's habeas corpus petition ruled it had no jurisdiction to make such a finding notwithstanding a provision of California law that contemplated a court might make such a finding.

11

The magistrate judge also rejected Larsen's alternative proposal to construe his motion as a Federal Rule of Civil Procedure 60(b)(6) request to clarify its previous order granting his habeas petition. (The rule allows a court to "relieve a party or its legal representative from a final judgment, order, or proceeding" for any "reason that justifies relief." (Fed. R. Civ. P. 60(b)(6).) The magistrate judge opined "[t]here was nothing vague or ambiguous about the Court's prior decisions in this matter." The court also remarked its *Schlup* order did not reach an "affirmative[ ] conclu[sion] that [Larsen] was actually innocent of possessing a dagger" and cited authority holding *Schlup* "'does not require absolute certainty about the petitioner's guilt or innocence.'"

The district court again accepted the magistrate judge's recommendation and denied Larsen's motion.

### F.     The Board's Denial of Larsen's Claim

In 2014, Larsen filed his claim for wrongful felony conviction and imprisonment, seeking compensation for 4,963 days in prison. The Board, believing itself unconstrained by several aspects of the federal court habeas proceedings, denied Larsen's claim.

The Board first rejected Larsen's most consequential argument, i.e., that it must recommend compensation without holding a hearing of its own because the federal habeas proceedings resulted in a determination of factual innocence. In the Board's view, no such finding was ever made because the pertinent California statute, section 1485.55, requires an affirmative finding of factual innocence and the *Schlup* finding

12

that no reasonable juror would have convicted Larsen is "not at all equivalent to finding him innocent."

The Board additionally believed it was not bound by all the factual and witness credibility determinations made during the federal habeas proceedings. The Board concluded it could not disregard the district court's finding that the McNutts provided credible testimony, but the Board believed it was bound only by the district court's findings in support of its order granting Larsen's habeas petition—not the findings made when determining the untimely petition could proceed under *Schlup*. Thus, in practical terms, the Board accepted the district court's finding that "'the McNutts were credible and persuasive witnesses' whose informal statements and formal testimony 'maintained a consistent version of events,'" but the Board disregarded "the [court's] findings when ruling on *Schlup* that the McNutts had 'no apparent reason to perjure themselves,' they both 'had unobstructed views of [Hewitt] and [Larsen], unlike Townsend and Rex,' that Mr. McNutt 'was standing only two feet from [Hewitt] when [Hewitt] threw the object[,'] and it was 'unbelievable' that the McNutts would fly across the country 'to give perjurious testimony on behalf of [Larsen], with whom they have no ties.'"

The Board did recognize it was bound by the district court's finding that McCracken credibly testified that someone other than Larsen threatened him with a knife, but the Board emphasized this did not preclude a finding that Larsen possessed the knife (or a different knife) later that evening. The Board determined the district court made no findings as to the credibility of Hewitt and Owen's declarations and, based on Hewitt's testimony at the civil trial, found neither declaration

13

provided credible evidence of Larsen's innocence. The district court's only binding credibility finding as to Larsen himself, in the Board's view, related to his assertion that he learned of the McNutts' identities after his conviction.

The Attorney General also submitted exhibits in the Board proceedings including prison records and criminal history reports for Larsen, Hewitt, and Alfred, another son or step-son of the McNutts. These indicated, among other things, that Larsen and Alfred both had ties to Neo-Nazi gangs. (Hewitt admitted he previously belonged to the same gang as Larsen in a 2015 deposition.) Although the allegation could not be corroborated, Alfred was investigated for allegedly directing an associate to solicit Larsen and Hewitt to kill two police officers in 1998. The Board stated it considered this evidence "solely . . . to the extent it show[ed] that Larsen ran in the same social circles" as Hewitt, Alfred, and others.

Weighing the evidence, the Board found the McNutts must have been mistaken about who threw the knife because Officers Townsend and Rex had a compelling reason to focus on Larsen, whose shirt matched the description of the reported gunman. The officers were unlikely to have mistaken Larsen for Hewitt, the Board believed, because both McNutts testified Hewitt wore a different style of shirt. The Board also reasoned the officers, who had been partners for only a short time, did not know Larsen and had no motive to "frame" him. Additionally, the Board highlighted several other considerations to "bolster[ ]" its conclusion: (1) the prosecutor intended to retry Larsen but for a change in the law, (2) the jury appeared to have found the officers more credible than Mr. McNutt in the civil litigation, (3) Hewitt's association with Larsen made it "unlikely" Hewitt would have

14

remained silent on the night of Larsen's arrest if the knife had been his, and (4) Larsen's account of the events preceding his arrest contradicted the credible testimony of other witnesses in several respects.

### G. *Petition for Writ of Mandate*

Larsen challenged the Board's denial of compensation via a petition for a writ of administrative mandamus pursuant to Code of Civil Procedure section 1094.5. The trial court found the Board erred in concluding it was not bound by the district court's *Schlup* findings because the district court's order granting Larsen's habeas petition "essentially incorporated" those findings. The trial court determined the error was harmless, however, because even if the McNutts and McCracken testified credibly, Officers Townsend and Rex's testimony established Larsen threw the knife. The trial court further reasoned that Larsen waived his argument that the Board's decision was not supported by substantial evidence and the argument lacked merit in any event.

## II. DISCUSSION

As we shall discuss, the trial court should have granted Larsen's mandamus petition because the federal court's *Schlup* finding and the later grant of habeas relief that resulted in Larsen's release from prison without retrial by the state amount to a finding of factual innocence that the Legislature intended to be binding, and to preclude holding a Board hearing.[5] In

---

[5] Although Larsen made this argument to the Board and in his writ petition commencing the mandamus proceedings, he did not raise it in his trial brief and the trial court did not consider it

15

concluding otherwise, the Board did not accord the *Schlup* finding the significance it deserves and the Board construed section 1485.55, subdivision (a) (hereafter section 1485.55(a)) in a manner that undermines the Legislature's intent and effectively renders the statutory provision inoperative in practice.

### A. California's Exonerated Inmate Compensation Statutes

"California has long had a system for compensating exonerated inmates for the time they spent unlawfully imprisoned." (*People v. Etheridge* (2015) 241 Cal.App.4th 800, 806.) The Board "is vested with the power to recommend to the Legislature that an inmate be compensated if it finds the inmate eligible under the statutory scheme." (*Ibid.*)

A person may present a claim to the Board "for the pecuniary injury sustained by him or her through . . . erroneous conviction and imprisonment or incarceration" when "the evidence shows that the crime with which the claimant was charged was either not committed at all, or, if committed, was not committed by the claimant." (§ 4900; see also § 4904.) If the evidence shows the claimant "has sustained injury through his or her erroneous conviction and imprisonment, the [Board] shall report the facts of the case and its conclusions to the next Legislature, with a recommendation that the Legislature make

in its ruling. We believe the point was sufficiently raised to permit appellate review. It is also a purely legal issue involving a matter of public interest that we would have discretion to resolve. (*Bialo v. Western Mutual Ins. Co.* (2002) 95 Cal.App.4th 68, 73; *Nguyen v. Applied Medical Resources Corp.* (2016) 4 Cal.App.5th 232, 258.)

an appropriation for the purpose of indemnifying the claimant for the injury. The amount of the appropriation recommended shall be a sum equivalent to one hundred forty dollars ($140) per day of incarceration served . . . ."[6] (§ 4904.) As we next discuss, the findings made by a court granting habeas relief determine both whether a Board hearing is necessary and the scope of the Board's duties.

Section 1485.55 describes the circumstances under which court findings in postconviction litigation are binding on the Board and require an automatic recommendation for compensation to the Legislature. Under subdivision (a) of the statute—the key provision for our purposes[7]—the Board "shall,

---

[6]    Board recommendations for compensation are just that, recommendations. Legislators can—and do—vote against bills making appropriations for the payment of such claims, as evidenced by two votes cast against a recent appropriations bill. (Sen. Bill No. 417 (2019-2020 Reg. Sess.) [bill appropriating $5,087,040 to seven claimants passed by vote of 31 to 2 in the Senate].)

[7]    Another subdivision, section 1485.55, subdivision (e), makes specific reference to habeas corpus proceedings in federal court: "If a federal court, after granting a writ of habeas corpus, pursuant to a nonstatutory motion or request, finds a petitioner factually innocent by no less than a preponderance of the evidence that the crime with which they were charged was either not committed at all or, if committed, was not committed by the petitioner, the [B]oard shall, without a hearing, recommend to the Legislature that an appropriation be made and any claim filed shall be paid pursuant to Section 4904." We invited the parties to address, in supplemental briefing, whether subdivision

17

without a hearing, recommend to the Legislature that an appropriation be made and the claim paid" when "[i]n a contested proceeding . . . the court has granted a writ of habeas corpus . . . and . . . has found that the person is factually innocent."[8]

In all other cases—i.e., in the absence of a court finding of factual innocence—a hearing is required. (§ 4903, subd. (a).) Certain findings made in earlier court proceedings are still binding on the Board at such a hearing, but the Board is not bound to recommend compensation. (See, e.g., § 4903, subd. (b) ["In a hearing before the [B]oard, the factual findings and credibility determinations establishing the court's basis for granting a writ of habeas corpus . . . shall be binding on the Attorney General, the factfinder, and the [B]oard"]; § 1485.5, subd. (c) ["In a contested or uncontested proceeding, the express factual findings made by the court [meaning a state or federal

---

(e) is the governing statutory provision in this case. The parties agree it is not.

[8] Section 1485.55, subdivision (b) separately permits a habeas corpus petitioner, when "the court has granted a writ of habeas corpus," to "move for a finding of factual innocence by a preponderance of the evidence that the crime with which they were charged was either not committed at all or, if committed, was not committed by the petitioner." Subdivision (b) applies to contested and uncontested habeas corpus proceedings (whereas subdivision (a) applies only to contested proceedings) and subdivision (b) includes the "preponderance of the evidence" language that subdivision (a) does not. A finding of factual innocence under subdivision (b) is binding on the Board and requires a recommendation for compensation just as a subdivision (a) finding does. (§ 1485.55, subd. (c).)

court (§ 1485.5, subd. (e))], including credibility determinations, in considering a petition for habeas corpus . . . shall be binding on the Attorney General, the factfinder, and the . . . Board"].)

### B. Schlup *and Innocence*

The resolution of this appeal turns on two questions: (1) what does *Schlup*, *supra*, 513 U.S. 298 require a federal court to find to avoid an otherwise applicable procedural bar to a habeas corpus petition and (2) does that finding satisfy what the Legislature meant by "factually innocent" in section 1485.55(a)? We begin with the first of these two, carefully parsing *Schlup* and briefly discussing its progeny.

As a general rule, claims that are forfeited under state law or are otherwise procedurally barred "may support federal habeas relief only if the prisoner demonstrates cause for the default and prejudice from the asserted error." (*House v. Bell* (2006) 547 U.S. 518, 536 (*House*); see also *Schlup*, *supra*, 513 U.S. at 318-319.) An exception to the general rule applies, however, when a petitioner "falls within the 'narrow class of cases . . . implicating a fundamental miscarriage of justice.'" (*Schlup*, *supra*, at 314-315.) The high court in *Schlup* considered whether a "claim of innocence" by the habeas petitioner in that case was sufficient to satisfy the fundamental miscarriage of justice standard and thereby permit a federal court to decide his ineffective assistance of counsel and *Brady v. Maryland* (1963) 373 U.S. 83 claims of constitutional error even though he did not raise them in an earlier-filed habeas corpus petition. (*Schlup*, *supra*, at 301, 314.)

Schlup presented evidence he was "actually innocent" of the prison murder for which he had been found guilty and sentenced to death. (*Schlup*, *supra*, 513 U.S. at 307 [referencing, among

19

other things, "numerous affidavits from inmates attesting to Schlup's innocence"].)  The district court evaluating the habeas petition applied a stringent standard for evaluating Schlup's actual innocence showing—the so-called *Sawyer*[9] standard that requires clear and convincing proof—and the principal issue the United States Supreme Court resolved was whether the district court should have used that standard or a lower standard espoused in another precedent, *Murray v. Carrier* (1986) 477 U.S. 478 (*Carrier*).

The high court held the district court erred and should have used the *Carrier* standard of proof, namely, whether a "'constitutional violation has probably resulted in the conviction of one who is actually innocent.'" (*Schlup, supra*, 513 U.S. at 326-327, quoting *Carrier, supra*, 477 U.S. at 496; *id.* at 332 [remanding for further factual development].)  "To establish the requisite probability," the Supreme Court held, "the [habeas] petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence [of actual innocence]." (*Schlup, supra*, at 327; see also *ibid.* ["To satisfy the *Carrier* gateway standard, a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt"].) Significantly for our purposes, the *Schlup* court treated the *Carrier* standard it adopted to govern actual innocence claims like Schlup's as functionally equivalent to the standard applied in

---

9       *Sawyer v. Whitley* (1992) 505 U.S. 333, 336 [a petitioner "must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law"] (*Sawyer*).

*Kuhlmann v. Wilson* (1986) 477 U.S. 436 (*Kuhlmann*)—a companion case decided on the same day as *Carrier* that used the term "colorable claim of factual innocence" rather than *Carrier*'s "actually innocent" terminology. (*Schlup, supra,* at 322 ["The *Kuhlmann* plurality, though using the term 'colorable claim of factual innocence,' elaborated that the petitioner would be required to establish, by a '"fair probability,"' that '"the trier of the facts would have entertained a reasonable doubt of his guilt"'"].)

The *Schlup* court additionally clarified that the *Carrier* standard does not require, or permit, a district court to make its own "independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do." (*Schlup, supra,* 513 U.S. at 329; see also *ibid.* ["The meaning of actual innocence as formulated by *Sawyer* and *Carrier* does not merely require a showing that a reasonable doubt exists in light of the new evidence, but rather that *no reasonable juror would have found the defendant guilty*"], italics added.) The *Schlup* court further explained—and this is again important for our purposes—that the reasonable doubt focus of *Carrier*'s actual innocence standard "reflects the proposition, firmly established in our legal system, that the line between innocence and guilt is drawn with reference to a reasonable doubt." (*Schlup, supra,* at 328; *ibid.* ["Thus, whether a court is assessing eligibility for the death penalty under *Sawyer*, or is deciding whether a petitioner has made the requisite showing of innocence under *Carrier*, the analysis must incorporate the understanding that proof beyond a reasonable doubt marks the legal boundary between guilt and

21

innocence"]; see also *id.* at 328, fn. 47 ["Actual innocence, of course, does not require innocence in the broad sense of having led an entirely blameless life"].)

The high court in *Schlup* also distinguished its adoption of the *Carrier* standard from a different standard of actual innocence discussed in another of its precedents, *Herrera v. Collins* (1993) 506 U.S. 390 (*Herrera*). In that case, the high court assumed habeas corpus relief may be available for a defendant sentenced to death after "entirely fair and error[-]free" criminal proceedings if the defendant could nevertheless show by new evidence that he or she were actually innocent of the crime. (*Schlup*, *supra*, 513 U.S. at 314; see also *House*, *supra*, 547 U.S. at 554; *Herrera*, *supra*, at 417 ["We may assume, for the sake of argument in deciding this case, that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim"].)

The Supreme Court explained a *Herrera*-based claim and a claim of the type presented by Schlup both require presentation of evidence of actual innocence that is distinct from asserted legal error at trial. (*Schlup*, *supra*, 513 U.S. at 324 [a credible *Schlup*-type claim of actual innocence "requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial"]; *id.* at 316 ["[I]f a petitioner such as Schlup presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless

22

constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims"].)  But the Court contrasted Schlup's "procedural" claim of innocence (i.e., a showing to enable review of his claims of constitutional error at trial) with the "substantive" claim of innocence discussed in *Herrera* (a showing assuming trial and sentencing were free from prejudicial error) and explained evidence of innocence adduced by a petitioner like Schlup "need carry less of a burden."  (*Id.* at 314-316.)  Specifically, the Supreme Court explained a *Herrera*-type claim would have to fail unless a federal habeas court is convinced that new facts "unquestionably establish . . . innocence" while a *Schlup*-type innocence showing is evaluated using the aforementioned *Carrier* standard: whether it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.  (*Id.* at 317 ["[I]f the habeas court were merely convinced that those new facts raised sufficient doubt about Schlup's guilt to undermine confidence in the result of the trial without the assurance that the trial was untainted by constitutional error, Schlup's threshold showing of innocence would justify a review of the merits of the constitutional claims"].)

Though the high court explained a *Schlup*-type innocence showing is not so high as a *Herrera* "unquestionabl[e]," "extraordinarily high" showing (*Schlup, supra*, 513 U.S. at 317; *Herrera, supra*, 506 U.S. at 417), the Supreme Court repeatedly emphasized the *Carrier*-based requirement for a claim of actual innocence like Schlup's is still quite demanding—so much so that substantial claims of such innocence are rarely advanced and even more rarely successful.  (*Schlup, supra*, at 321 ["[H]abeas corpus petitions that advance a substantial claim of actual

23

innocence are extremely rare.  Judge Friendly's observation a quarter of a century ago that 'the one thing almost never suggested on collateral attack is that the prisoner was innocent of the crime' remains largely true today"], footnote omitted; *id.* at 321, fn. 36 ["Indeed, neither party called our attention to any decision from a Court of Appeals in which a petitioner had satisfied any definition of actual innocence.  Though some decisions exist [citations], independent research confirms that such decisions are rare"]; *id.* at 324 [because new, reliable evidence of actual innocence "is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful"].)  In light of the observed rarity of substantial claims of actual innocence like Schlup's, the Supreme Court was unconcerned with threats to judicial resources, finality, and comity that collateral attacks on state court judgments might otherwise pose.  (*Id.* at 324.)

United States Supreme Court cases following *Schlup* continued to emphasize the demanding nature of the actual innocence showing that case requires and the rarity with which such showings are made.  (*McQuiggin v. Perkins* (2013) 569 U.S. 383, 386 (*McQuiggin*) [the "convincing showing of actual innocence" required under *Schlup* is a "'demanding'" standard and "tenable actual-innocence gateway pleas are rare"]; *House*, *supra*, 547 U.S. at 522 [*Schlup* permits merits review of procedurally barred claims in "certain exceptional cases involving a compelling claim of actual innocence"]; *Bousley v. United States* (1998) 523 U.S. 614, 623 (*Bousley*).)  At the same time, the cases also recognize that "conclusive exoneration" is not required.  (See, e.g., *House, supra*, at 553.)  Rather, under *Schlup*, a petitioner must demonstrate it is "more likely than not, in light of the new

24

evidence, no reasonable juror would find him guilty beyond a reasonable doubt" (*House*, *supra*, at 538), and such a finding demarcates the legal boundary between guilt and innocence (*Schlup*, *supra*, 513 U.S. at 328).

C. *The Board Should Have Recommended Compensation Without a Hearing, and a Recent Case That Would Support a Contrary Conclusion Is Not Persuasive*

We come now to the second of the questions outlined earlier: whether a *Schlup* innocence finding as just described is tantamount to what the Legislature meant by "factually innocent" as used in section 1485.55(a). To reiterate, that provision reads: "In a contested proceeding, if the court has granted a writ of habeas corpus . . . and if the court has found that the person is factually innocent, that finding shall be binding on the . . . Board for a claim presented to the [B]oard, and upon application by the person, the [B]oard shall, without a hearing, recommend to the Legislature that an appropriation be made and the claim paid pursuant to Section 4904."

Other subdivisions in section 1485.55 use the term "factually innocent" as well, and these subdivisions further specify that a court finding of factual innocence must be made by a preponderance of the evidence. (See, e.g., § 1485.55, subd. (c) ["If the court makes a finding that the petitioner has proven their factual innocence by a preponderance of the evidence pursuant to subdivision (b), the [B]oard shall, without a hearing, recommend to the Legislature that an appropriation be made . . ."]; § 1485.55, subd. (e) ["If a federal court, after granting a writ of habeas corpus . . . finds a petitioner factually innocent by no less than a preponderance of the evidence that the crime with which they

25

were charged was either not committed at all or, if committed, was not committed by the petitioner, the [B]oard shall, without a hearing, recommend to the Legislature that an appropriation be made . . ."].)  Larsen not unreasonably argues the Legislature's use of somewhat different language in section 1485.55(a) is intentional and should be read to indicate section 1485.55(a) carries a different meaning, but we think the better view is that all the statutory subdivisions mean the same thing: a court finding of factual innocence must be made by at least a preponderance of the evidence and must reflect a determination that the person charged and convicted of an offense did not commit the crime.  (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 594 ["When a statute is silent on the standard of proof, the preponderance of the evidence standard ordinarily applies," citing Evidence Code section 115]; see also *Pasadena Police Officers Assn. v. City of Pasadena* (1990) 51 Cal.3d 564, 575 [courts should strive to harmonize statutory sections relating to the same subject to the extent possible].)  The question still remains, however, whether a *Schlup* innocence finding coupled with a later grant of habeas relief that results in the permanent release of a prisoner from custody satisfies section 1485.55(a) as so understood.[10]

Pursuant to well-settled law, we presume the Legislature was aware of the high court's holding in *Schlup* (and its progeny) when it amended section 1485.55 in 2016 to read (in pertinent part) as it does today.  (*Leider v. Lewis* (2017) 2 Cal.5th 1121,

---

[10]    By "permanent" we mean only that there is no subsequent conviction that results in the petitioner's reincarceration for the same conduct for which the petitioner was previously in custody.

1135 ["We presume the Legislature was aware of existing judicial decisions directly bearing on the legislation it enacted"]; *People v. Giordano* (2007) 42 Cal.4th 644, 659 ["The Legislature is presumed to be aware of '"judicial decisions already in existence, and to have enacted or amended a statute in light thereof. [Citation]"'"]; see also Stats. 2016, ch. 785, § 3.)  That makes our job easier: we need only compare the text and history of section 1485.55(a) with a rigorous exegesis of *Schlup* to see if a *Schlup* finding is within the scope of what the Legislature intended as a court finding of factual innocence that would obviate the need for a Board hearing.  For the reasons that immediately follow, it is; the *Schlup* standard and the text and history of section 1485.55(a) match remarkably well.

Beginning at just a surface level analysis, the high court itself in *Schlup* explains that the finding of "actual innocence" it requires to overcome an otherwise applicable procedural bar is functionally the same as a showing of "factual innocence."  As highlighted in our earlier parsing of *Schlup*, the Supreme Court explained the *Carrier* standard of proof it adopted for claims of innocence like Schlup's was functionally no different than the "'colorable claim of factual innocence'" standard in the *Kuhlmann* case decided on the same day as *Carrier*.  (*Schlup, supra*, 513 U.S. at 322 ["In addition to linking miscarriages of justice to innocence, *Carrier* and *Kuhlmann* also expressed the standard of proof that should govern consideration of those claims.  In *Carrier*, for example, the Court stated that the petitioner must show that the constitutional error 'probably' resulted in the conviction of one who was actually innocent.  The *Kuhlmann* plurality, though using the term 'colorable claim of factual innocence,' elaborated that the petitioner would be required to

27

establish, by a "'fair probability,'" that "'the trier of the facts would have entertained a reasonable doubt of his guilt'"']; see also *Bousley, supra,* 523 U.S. at 623 ["'actual innocence' means factual innocence, not mere legal insufficiency"].)  The Legislature therefore would have been aware that, as a matter of terminology, using "factually innocent" in section 1485.55(a) would not have meant something different than *Schlup*'s use of "actually innocent."

Proceeding beneath the surface, *Schlup*'s requirements for what a habeas corpus petitioner must do as a matter of practice to obtain relief closely resembles a preponderance of the evidence showing that the petitioner—factually—is not the person who committed the crime of conviction.  Start, for instance, with the evidentiary burden.  Section 1485.55(a) as we construe it requires a showing of innocence by a preponderance of the evidence.  The *Schlup* standard requires a petitioner to show a constitutional violation has "probably" resulted in the conviction of one who is actually innocent and this probability is measured by whether it is "more likely than not" (*Schlup*, *supra*, 513 U.S. at 327)—which is, of course, the preponderance of the evidence standard.  In addition to this identical evidentiary burden, *Schlup* also makes clear that the requisite showing of innocence must be fact-based in the sense of being *separate from claims of legal error at trial* and grounded in new, reliable evidence.  (*Schlup*, *supra*, at 324 ["[E]xperience has taught us that a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare.  [Citation.]  To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical

28

physical evidence—that was not presented at trial"].)  This new, reliable evidence of innocence that is distinct from assertions of constitutional error must be so strong that "no reasonable juror" would have convicted the petitioner in light of the new evidence. (*Id.* at 327; see also *House*, *supra*, 547 U.S. at 571 (dis. opn. of Roberts, J.) [under *Schlup*, "House must present such compelling evidence of innocence that it becomes more likely than not that no single juror, acting reasonably, would vote to convict him"].) Putting these elements together, a court making a *Schlup* finding determines that new facts (i.e., new, reliable evidence bearing on the crime of conviction) make it more likely than not that no reasonable juror would vote to convict.  And importantly, *Schlup* explains that this juror-determination-based standard "reflects the proposition, firmly established in our legal system, that the line between innocence and guilt is drawn with reference to a reasonable doubt."  (*Schlup*, *supra*, at 328.)  The Legislature, aware of *Schlup* in enacting and amending section 1485.55, would have known this, and there is accordingly no reason to believe the Legislature intended to prevent a fact-based showing predicated on this firmly established legal boundary from answering the question of whether a former prisoner now released from custody committed the crime of conviction.[11]

---

[11]     We of course have no quarrel with the general concept that a jury's acquittal of a defendant after considering evidence admitted during a criminal trial is not a determination that the defendant is innocent, only that he or she is "not guilty."  But here we are concerned with the concept of innocence as used in a specialized area of the law—and, particularly, how the Legislature and the *Schlup* court understood "innocence" in postconviction litigation.  For purposes of section 1485.55(a), and for the reasons already given, the Legislature's concept of factual

29

Our conclusion that a court's *Schlup* finding coupled with a permanent release from custody pursuant to a writ of habeas corpus satisfies the requirements of section 1485.55(a) is thus apparent on the face of the statute and *Schlup* itself.  It also flows equally from the legislative history of Senate Bill No. 1134 (2015-2016 Reg. Sess.) (SB 1134) the bill that (1) amended section 1485.55 as relevant for our purposes and (2) adopted a new standard for deciding habeas corpus petitions that seek relief based on new evidence.

Prior to SB 1134's enactment, a prisoner in California could obtain state habeas corpus relief based on newly discovered evidence that "undermine[s] the entire prosecution case and point[s] unerringly to innocence or reduced culpability." (*In re Hardy* (2007) 41 Cal.4th 977, 1016; accord, *In re Lawley* (2008) 42 Cal.4th 1231, 1238.)  Former section 1485.55(a) mirrored this common law standard: "In a contested proceeding, if the court grants a writ of habeas corpus concerning a person who is unlawfully imprisoned or restrained, . . . , and if the court finds that new evidence on the petition *points unerringly to innocence*, that finding shall be binding on the [Board] for a claim presented to the [B]oard, and upon application by the person, the [B]oard shall, without a hearing, recommend to the Legislature that an appropriation be made and the claim paid . . . ." (Stats. 2013, ch. 800, § 3, italics added.)

In addition to amending section 1485.55(a) in the manner relevant for our purposes, SB 1134 also codified a new standard

innocence encompasses a *Schlup* innocence finding, i.e., that the person charged probably did not commit the crime and hence no juror would convict him or her.

to govern court determinations of whether habeas corpus relief should be granted.  Specifically, SB 1134 amended the pertinent Penal Code provision to permit courts to grant habeas corpus petitions presenting "[n]ew evidence . . . that is credible, material, presented without substantial delay, and of such decisive force and value that *it would have more likely than not changed the outcome at trial*."  (§ 1473, subd. (b)(3)(A), italics added.)  In what legislative reports described as a "conforming" change (see, e.g., Assem. Com. on Appropriations, Analysis of Sen. Bill No. 1134 (2015-2016 Reg. Sess.) Aug. 3, 2016, at 5; Sen. Com. on Pub. Safety, Analysis of Sen. Bill No. 1134 (2015-2016 Reg. Sess.) Apr. 5, 2016, at 9), SB 1134 similarly replaced former section 1485.55(a)'s reference to a "find[ing] that new evidence . . . points unerringly to innocence" with the current text that refers to a "[finding] that the person is factually innocent."

This history demonstrates the Legislature intended to lower the threshold at which a court finding would obviate the need for a Board hearing, to preserve the link between the test for granting habeas corpus relief based on new evidence on the one hand and entitlement to compensation without a Board hearing on the other, and to consider what a trial jury would do as the line demarcating guilt and innocence.  (See, e.g., Sen. Com. on Pub. Safety, Analysis of Sen. Bill No. 1134 (2015-2016 Reg. Sess.) Apr. 5, 2016, at 7 [author's statement that the bill was intended "to bring California's innocence standard into line with the vast majority of other states' standards, forty-three in total, and to bring it closer in line with other postconviction standards for relief such as ineffective assistance of counsel, or prosecutorial misconduct, and not so unreasonably high]; Sen. Com. on Appropriations, Analysis of Sen. Bill 1134 (2015-2016 Reg. Sess.),

31

Apr. 18, 2016, at 1 [amendments to sections 1473, subdivision (b)(3) and 1485.55(a) would work in tandem because "[p]otential increases in the number of claims submitted for review [in light of the lower standard for new evidence-based habeas corpus relief] are estimated to be offset in whole or in part by the reduced workload resulting from potentially fewer required hearings in order to recommend an appropriation for claims prospectively"].)  Treating a *Schlup* finding combined with later habeas corpus release from custody as satisfying the new SB 1134-created section 1485.55(a) threshold is fully consistent with the intent suggested by the legislative materials because a habeas court's finding that new evidence "would have more likely than not changed the outcome at trial" under section 1473, subdivision (b)(3) is arguably a lesser showing than *Schlup*'s no reasonable juror would convict standard—and certainly no greater.

The realities of habeas corpus practice further cement our conclusion that a compensation recommendation without a Board hearing under section 1485.55(a) is required by a grant of habeas corpus relief following a *Schlup* finding.  As *Schlup* and subsequent cases repeatedly emphasize, it is "extremely rare" that a habeas corpus petitioner advances a substantial claim of innocence and rarer still that these actual innocence claims actually succeed.  (*Schlup*, *supra*, 513 U.S. at 321 & fn. 36, 324; accord, *McQuiggin*, *supra*, 569 U.S. at 386 ["tenable actual-innocence gateway pleas are rare"]; *House*, *supra*, 547 U.S. at 538.)  If a Board hearing is nevertheless required even in the circumstance where a court concludes a habeas corpus petitioner has succeeded in making the extremely rare and demanding *Schlup* innocence showing, section 1485.55(a) is practically dead

letter; we can fathom few if any circumstances in which a court in habeas corpus proceedings must make a more definitive pronouncement of innocence than the pronouncement *Schlup* requires.  Indeed, a *Herrera, supra*, 506 U.S. 390 finding of "unquestionabl[e]" innocence is all that immediately comes to mind, but at least so far, *Herrera* innocence claims are legal unicorns: assumed for argument's sake to be viable by some courts (see, e.g, *McQuiggin, supra*, 569 U.S. at 392) but never seen as the ultimately successful predicate for the grant of habeas corpus relief.

Treating habeas corpus relief after a *Schlup* finding as insufficient to satisfy the factual innocence criterion in section 1485.55(a) accordingly makes no practical sense, especially in light of the already-discussed evidence that the Legislature intended to broaden the circumstances in which a recommendation for compensation would be made without a Board hearing.  In addition, concluding habeas corpus relief after a *Schlup* finding does not meet the section 1485.55(a) test is also inconsistent with the legislative intent, identified in *Madrigal v. California Victim Comp. & Government Claims Bd.* (2016) 6 Cal.App.5th 1108, "to streamline the compensation process and ensure consistency between the Board's compensation determinations and earlier court proceedings related to the validity of a prisoner's conviction."[12]  (*Id.* at 1118.)

---

[12]     The magistrate judge's denial of Larsen's motion for a finding of innocence does not undermine the conclusion we reach. The court denied the motion because it had no jurisdiction to grant it, and without jurisdiction, the court had no proper basis to reach the merits of the motion.  The magistrate judge also rejected Larsen's alternative request to "clarify" its previous order granting his habeas petition so as to predetermine the

A recent Court of Appeal opinion, however, reaches a conclusion contrary to ours on the identical issue presented. (*Souliotes v. California Victim Comp. Bd.* (2021) 61 Cal.App.5th 73 (*Souliotes*).) The *Souliotes* court determined the Board properly held a compensation hearing and denied compensation to a habeas corpus petitioner who succeeded in making a *Schlup* actual innocence showing in federal court and was later released from prison on a writ of habeas corpus. (*Id.* at 79-80; but see *id.* at 80 [explaining the petitioner, after the grant of habeas corpus relief, entered no contest pleas to involuntary manslaughter charges to avoid retrial].) The rationale animating the result reached in *Souliotes* is not persuasive.

Beginning where we agree, the *Souliotes* court concluded, after fairly lengthy discussion, that section 1485.55(a)'s "factually innocent" language means the same thing as the slightly different language that appears in other subdivisions of section

---

then-pending claim for compensation before the Board, but this is no more than an unremarkable example of the cardinal principle of judicial restraint. (*PDK Laboratories Inc. v. U.S. D.E.A.* (D.C. Cir. 2004) 362 F.3d 786, 799 (conc. opn. of Roberts, J.) ["if it is not necessary to decide more, it is necessary not to decide more"].) The magistrate judge was required to decide—and did decide— whether *Schlup* permitted reaching Larsen's claims on the merits, but the judge abstained (appropriately) from deciding any more than necessary. As we have explained, what the court already had to decide and did decide was enough for section 1485.55(a) purposes. Further, even taking the magistrate judge's observations on their own terms, the judge rejected Larsen's motion apparently believing he was seeking an affirmative finding of innocence in the *Herrera* sense.

1485.55 (i.e., that a petitioner was found by a preponderance of the evidence not to have committed the crime charged). (*Souliotes*, *supra*, 61 Cal.App.5th at 89-90.)  We have already explained that is indeed the best view of the statutory scheme. Apparently overlooked in *Souliotes*, however, are the features and implications of the *Schlup* opinion's analysis.  The *Souliotes* court also casts aside good evidence of the Legislature's intent in amending section 1485.55 without good reason.  We will elaborate.

 *Souliotes* rightly acknowledges that "the terms 'actual innocence' and 'factual innocence' are used interchangeably" (*Souliotes*, *supra*, 61 Cal.App.5th at 76), but it does not mention *Schlup* itself understands the two terms to be functionally equivalent, as evidenced by the discussion of *Kuhlmann* and *Carrier*.  Though not alone dispositive, that is a significant point in favor of the conclusion we have already drawn, i.e., that section 1485.55(a)'s "factual innocence" requirement should not be read to exclude a *Schlup* "actual innocence" finding.  The key reckoning with *Schlup* in *Souliotes* instead comes in a single sentence and citation:  "In other words, 'actual innocence' as used in a *Schlup* gateway finding is a finding that the petitioner could not be found guilty, beyond a reasonable doubt, of the crime in question and therefore is presumed innocent.  But it is not a factual finding that the petitioner did not commit the crime in question.  (See *House, supra*, 547 U.S. at p. 538[ ] [in determining whether to allow a petitioner to pass through the *Schlup* gateway, '[t]he court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors'].)" (*Souliotes*, *supra*, at 88.)

This reasoning, in our view, is flawed. As we have already explained, a *Schlup* innocence finding is a factual finding—it is separate from constitutional error asserted as the grounds for habeas corpus relief and it must be based on new, reliable evidence. It is also a fact-based finding that must clear a high threshold, namely, that it is more probable than not no juror aware of the new evidence would vote to convict. A court that makes such a determination of innocence does not "presume[ ]" the habeas corpus petitioner innocent. Rather, there already exists a judgment of conviction after a criminal trial and a court must decide whether the petitioner's *evidentiary* showing of innocence is sufficiently strong to overcome the interest in preserving the finality of that judgment via an otherwise procedurally barred habeas corpus petition.[13] Particularly when

_____

[13]     *Souliotes*'s citation to *House* as authority for its contrary view is not convincing, as the weaker "see" signal tends to reveal. A reading of the full context for the quoted statement in *House* confirms that the Supreme Court was not saying courts do not make factual determinations about whether a habeas corpus petitioner committed the charged crime when confronted by a *Schlup* actual innocence claim. Rather, the high court was merely describing how *Schlup*'s high standard of proof should operate in practice, namely, a court should not decide itself whether the evidence of innocence is compelling but should instead consider whether any single juror could reasonably vote to convict after considering the new evidence. (*House, supra*, 547 U.S. at 537-538 ["Our review in this case addresses the merits of the *Schlup* inquiry, based on a fully developed record, and with respect to that inquiry *Schlup* makes plain that the habeas court must consider "'all the evidence,'" old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.' [Citation.] Based on this total record, the court must make 'a

36

"proof beyond a reasonable doubt marks the legal boundary between guilt and innocence" in postconviction litigation, a finding that evidence of the petitioner's innocence is so strong that it is more likely than not that no reasonable juror would vote to convict, when coupled with a habeas corpus petitioner's release from custody, is a more likely than not determination that the petitioner released did not commit the crime charged—as contemplated by the Legislature in section 1485.55(a).

*Souliotes* also treats as unconvincing the legislative history evidence we have already reviewed—in particular, the parallels between the changes to section 1473's standards for granting a habeas corpus petition based on new evidence and the "conforming" amendments made to section 1485.55(a). *Souliotes*'s reasons for refusing to find this history illuminating are not sound.

*Souliotes* concedes there is "no doubt that the Legislature intended to broaden the class of innocence findings subject to section 1485.55(a)" but concludes it "goes too far" to "suggest[ ] that the amendment of that provision necessarily expands the class to include *Schlup* gateway findings." (*Souliotes*, *supra*, 61 Cal.App.5th at 92.) The argument appears to rest on the incomplete understanding of *Schlup* that we have already highlighted, and it does not reckon with one of the key points

---

probabilistic determination about what reasonable, properly instructed jurors would do.' [Citation.] The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors"]; see also *Bousley*, *supra*, 523 U.S. at 623 ["'actual innocence' means factual innocence, not mere legal insufficiency"].)

37

shown by SB 1134's simultaneous amendment of section 1473 and section 1485.55(a): factual innocence showings, including a demonstration of whether a compensation claimant committed the crime charged, are to be judged by reference to what a trial jury would do.  (Stats. 2016, ch. 785, § 1 [amending section 1473, subdivision (b)(3)(A) by replacing the former "points unerringly to innocence" language with language that only requires evidence to be "of such decisive force and value that it would have more likely than not changed the outcome at trial"]; Stats. 2016, ch. 785, § 3 [analogously striking former section 1485.55(a)'s reference to a "find[ing] that new evidence . . . points unerringly to innocence" in favor of the current text that refers to a "[finding] that the person is factually innocent"].)  That focus on what jurors would do in light of new evidence is fully consistent with, and satisfied by, what a court determines when concluding a *Schlup* innocence showing has been made.

Remarkably, the *Souliotes* court does recognize "the sponsors of [SB] 1134 may have intended the bill to amend section 1485.55 to require the Board, without holding a hearing, to recommend the grant of compensation for a section 4900 claim to a person who had obtained a finding by a habeas court that it is more likely than not that a jury would not find the person guilty beyond a reasonable doubt," but the *Souliotes* court concludes SB 1134 "did not accomplish this" and reasons it is "bound by the *expressed* language of the Legislature's enactment."  (*Souliotes*, *supra*, 61 Cal.App.5th at 93, italics in original.)  This "may have intended" reference is a significant understatement, but even on its own terms, the argument falters. The judiciary is a coordinate branch of government, not a bureau of exam proctors.  The plain text of section 1485.55(a) does not

foreclose the conclusion we reach, and if the intent of the Legislature can be discerned, which it can be here for the various reasons we have given—as even *Souliotes* seems to see, we do not disregard that intent because the Legislature did not accomplish its intention in the manner we deem best.

We are, in short, convinced the Legislature did not go to the trouble of enacting and amending section 1485.55(a) to require in habeas corpus proceedings an evidentiary showing so demanding and a court finding so rare as to be essentially impossible. Rather, returning to one point where we agree with *Souliotes*, "we have no doubt that the Legislature intended to broaden the class of innocence findings subject to section 1485.55(a)." (*Souliotes*, *supra*, 61 Cal.App.5th at 92.) A habeas corpus petitioner who makes a showing of actual innocence strong enough to convince a court to entertain an otherwise procedurally barred collateral attack on a final judgment and who then wins permanent release from prison on a writ of habeas corpus has been found factually innocent by a preponderance of the evidence. That is what Larsen did here, and the Legislature intended the Board to defer to the considered court findings that led to this point. It was error to hold a hearing when compensation should have been recommended automatically.

## DISPOSITION

The judgment is reversed and the matter is remanded to the trial court to enter a new judgment reversing the Board's order denying Larsen's compensation claim and directing the Board to recommend, pursuant to section 4904, that an appropriation be made and Larsen's claim paid.  Appellant shall recover his costs on appeal.

**CERTIFIED FOR PUBLICATION**

BAKER, J.

We concur:

RUBIN, P. J.

MOOR, J.